USCA1 Opinion

 

 November 8, 1994 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1451 ROBERT AUBE, Plaintiff, Appellant, v. CYNTHIA AUBE, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, U.S. Senior District Judge] __________________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin, Circuit Judge, _____________ and Keeton,* District Judge. ______________ ____________________ Kris Macaruso Marotti with whom Thomas A. Tarro III and Fortunato _____________________ ____________________ _________ & Tarro were on brief for appellant. _______ J. Ronald Fishbein for appellee. __________________ ____________________ ____________________  ____________________ *Of the District of Massachusetts, sitting by designation. Per Curiam. On November 19, 1982, Robert Aube entered __________ into a 50-year lease for a 7.7-acre tract of undeveloped land in Foster, Rhode Island, with his now deceased father, Frank Aube. Frank Aube leased the 7.7 acres to his son for an annual rent of $10, payable on the first business day of each December starting on December 1, 1982. The leased land was part of a larger piece of property owned by the senior Aube consisting of 77 acres and including a house and a pond. Robert Aube used the land to operate a plant nursery from 1983 to 1987. In preparing for the nursery, Robert Aube made several improvements to the property, including clearing four acres of the undeveloped land, installing two wells and an irrigation system, and constructing a greenhouse and a barn. In 1987 Robert Aube stopped operating the nursery because it was unprofitable, at which point he sold some of the nursery equipment and disconnected the plumbing and electricity to the greenhouse. Thereafter, Robert Aube returned to the nursery every six or eight months to check on its condition or to pick up various items he had stored there. In 1987 Frank Aube filed for Chapter 11 bankruptcy along with his wife, Cynthia Aube, who is Robert Aube's step- mother. Frank Aube died in December 1990. During the course of bankruptcy proceedings in 1992, the trustee of Frank Aube's estate filed an intended notice of sale to sell the -2- -2- entire 77-acre parcel, including the 7.7 acres. Robert Aube objected to the sale, arguing that he had a valid interest in the 7.7 acres for the remaining 40 years of the lease. On October 2, 1992, at the hearing on Robert Aube's objection, the bankruptcy court approved a payment of $33,000 to Robert Aube. In exchange, Robert consented to sale of the property, which was then sold with a clear title for $270,000. During the hearing, it was also agreed that a further hearing would be held to determine what additional amount, if any, Robert should receive to compensate him for his interest. If that interest was less than $33,000, Robert Aube was still entitled to keep the $33,000 already paid. In April 1993, the bankruptcy court heard two days of testimony concerning Robert Aube's claim for damages. Robert Aube treated the lease as having been rejected by the trustee in bankruptcy. See 11 U.S.C. 365. He then offered expert ___ testimony that the fee value of the 7.7 acres as improved was approximately $70,000. The expert was also prepared to testify that, on a somewhat different basis, the fee and improvements represented $126,000. This latter figure was adduced only as an offer of proof. In the course of the hearings, Robert Aube testified that he had no precise recollection as to when and where he had made the required $10 per year payments to his father, although he said that he was confident that he had made them at different times when -3- -3- he and his father chanced to be together. He did testify that a final payment had been tendered by a check to Cynthia Aube, but this occurred after Frank Aube's death, and the check was not accepted. No receipts had been obtained for any of the payments. On December 16, 1993, the bankruptcy court issued a decision and order that rejected Robert Aube's claim to any amount beyond the $33,000 already obtained. The court said that it did not credit Robert Aube's testimony that he had made the lease payments and concluded that Robert Aube's breach precluded his own suit for damages. The court also ruled, in the alternative, that damages had not been properly proved because damages had to be based on the value of the leasehold interest and not on the replacement cost of the premises as improved. On review, the district court summarily sustained the bankruptcy court, and this appeal followed. In our view, the bankruptcy court permissibly rejected the expert's testimony, and we affirm on that ground without reaching the question whether the lease was terminated because of Robert Aube's supposed failure to make payments. The problem with the expert's testimony arose at the outset when he said that he had not been able to value directly the leasehold interest Robert Aube possessed in the 7.7 acres in question. Apparently the expert was unable to find -4- -4- comparably improved rental property and was therefore unable to use comparable rental transactions to measure the value of the lease. This in turn led the expert to attempt to determine what it would cost, starting from scratch, to acquire unimproved land then to duplicate the improved property that Robert Aube had ultimately possessed. Over many objections and several adverse rulings, the expert ultimately managed to testify that he thought that the value of the 7.7 acres with improvements was approximately $70,000. He was not allowed to testify, but an offer of proof was submitted, as to a somewhat different computation that added the replacement cost of the improvements taken individually to annual rent for the land aggregated over a 40-year period. The total was $126,000. Our view of the evidence is somewhat different than the view taken by the bankruptcy judge but leads us to the same result. As we read the expert's testimony it was a morass of unexplained and inconsistent statements, due in no small measure to the way in which the testimony was adduced. At first, he appeared to say that he could not testify to the leasehold interest. Then he offered two different figures-- $70,000 (in testimony) and $126,000 (through the offer of proof)--apparently using the cost of the improvements as an element in both figures but never clearly explaining the reasons for the different treatment. -5- -5- In addition, the $70,000 figure was apparently offered as the fee value of the improved property, not the value of the use of the property for 40 years, although one could read the expert's testimony as taking different positions on this issue at different points. The $126,000 figure, which seemingly valued the land based on 40 years of aggregated rent, also treated the improvements as if they were owned by Robert Aube instead of being located on rented land that would eventually revert. We do not see how the cost of specific improvements made to facilitate a business that later failed could, without more explanation, provide a reliable basis for the valuation of property; nor do we understand how any valuation--whether for part or all of the property--could rest on the premise that Aube owned the land or improvements outright when at most he possessed a 40 year lease. If there is any answer to these flaws, both of which seem to have concerned the bankruptcy judge, the answer is not evident from the testimony. If we thought that a miscarriage of justice had occurred because of confusion in the presentation of the expert's testimony, we might be inclined to seek some solution other than outright affirmance. In this instance, however, we take note of the bankruptcy judge's final observation that the "entire 77 acre parcel of property (which included a -6- -6- substantial house) sold for $270,000 . . . ." Absent some other explanation, one might think that Robert Aube's $33,000 amply compensated him--indeed overcompensated him--for the 10 per cent of the property for which (at best) he held a 40- year lease. Affirmed. ________ -7- -7-